IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50834-6-II |
| Respondent, | |
| v. | |
| ANDRE ROBERT SARGENT, | UNPUBLISHED OPINION |
| Appellant. | |

RUMBAUGH, J.P.T.* — Andre Robert Sargent appeals his jury trial convictions for felony harassment-death threats and unlawful imprisonment, both of which were domestic violence offenses. He argues that (1) the trial court erred when it allowed the victim to testify that Sargent told her that he had been hearing voices in his head, (2) the to-convict instruction for the unlawful imprisonment charge failed to require jury unanimity, (3) the reasonable doubt instruction was improper, and (4) the trial court erred when it designated the felony harassment conviction as a domestic violence offense. He also argues that he received ineffective assistance of counsel when defense counsel (1) read portions of the victim's statement to the police, (2) opposed the removal of a juror, (3) rejected a limiting instruction regarding evidence of prior acts of domestic violence by Sargent against a different victim, (4) failed to object to the to-convict instruction for the

_____

* Judge Stanley J. Rumbaugh is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

unlawful imprisonment charge and the reasonable doubt instruction, and (5) failed to object to the application of the domestic violence designation on the felony harassment charge. In addition, Sargent argues that cumulative error deprived him of his right to a fair trial. We affirm.

FACTS

I. BACKGROUND

Brandi Nicole Crippen and Sargent started dating in October 2016. Crippen ended their relationship on March 2, 2017. On March 5, Crippen agreed to meet with Sargent at a location known as the Share House to exchange some of their personal items.

Crippen arrived at the Share House in her car and met Sargent on the street. After putting Crippen's items in the back seat of the car, Sargent got into the passenger's seat. Crippen told Sargent that she just wanted him to drop off her property, but Sargent told her that he needed to talk to her and asked her to drive around the corner. When Sargent persisted, Crippen drove two blocks away to an area that was "dark and secluded." 1 Report of Proceedings (RP) at 97.

After Crippen parked, Sargent told her that he had been "hearing voices in his head." 1 RP at 98. Sargent told Crippen that she "needed to sit there and listen to what he had to say." 1 RP at 101. The two then spoke about other issues, including whether Sargent had been faithful to her during their relationship. When Crippen asked Sargent to get out of her car and she put the car in drive, Sargent "slammed" the car into park, took the keys, and told Crippen "that [she] was going to listen to everything that he had to say" and that he "was in control." 1 RP at 102.

After taking the keys, Sargent told Crippen that she "wasn't going anywhere" and angrily threatened to punch her and knock her out if she attempted to escape. 1 RP at 103. Sargent then started yelling at Crippen and began "degrading . . . and demeaning [her]" and insisting that he

was "'in control'" and that she was "'going to listen to what [he had] to say.'" 1 RP at 104. Sargent threatened to "ruin" her life, attack her at work, and show up at her apartment with her ex-husband. 1 RP at 106. Sargent also threatened to send naked pictures of Crippen to her coworkers and boss, to beat Crippen, and to kill her. He also told Crippen that he was not afraid to go to prison for killing her, that she was "in the same boat as his baby's mother," and that as long as he was not in jail she (Crippen) was not safe. 1 RP at 109.

Despite Sargent's threats, Crippen attempted to escape three times. When she managed to open the car door the first time, Sargent reached over, slammed the door shut, "yanked" Crippen back into the car, and threatened to kill her if she tried to get out again. 1 RP at 111. The second time she tried to escape, Sargent was able to lock the door.

Sargent continued to threaten to kill Crippen and demanded that she drive to an even more secluded area. When Crippen pleaded with him and told him that she did not want to drive there, he threatened to knock her out and drive there himself if she did not follow his directions.

Crippen then saw another car and began honking the horn. This startled Sargent, and Crippen was able to get out of the car. While out of the car, Crippen managed to call her roommate, Soria Cudal, and told Cudal that she (Crippen) was being chased by someone. Sargent attempted to pursue Crippen and lure her back to the car. Crippen eventually managed to get back into the car and lock herself in. Sargent unsuccessfully attempted to get back into the car. Crippen eventually was able to drive away.

When she was five or six blocks away, the police contacted Crippen on her phone. Crippen did not know how the police knew her cell phone number, but she later testified that she may have dialed 911 after she was able to escape the car.

3

Crippen met with an officer at her home about an hour and a half later and gave him an oral statement. She did not want to give a written statement at that time because she "just wanted it to be over," and she knew from past experience that pursing the matter would be "hard" and "drawn out." 1 RP at 123.

After Sargent persisted in trying to contact her and appeared at her work and other locations, she decided to file a written statement. On April 4, Vancouver Police Detective Sandra Aldridge contacted Crippen, and Crippen agreed to provide a written statement. Crippen signed the statement under penalty of perjury on April 24. Detective Aldridge subsequently arrested Sargent.

## II. PROCEDURE

The State charged Sargent with felony harassment-death threats (domestic violence),[1] unlawful imprisonment, and fourth degree assault. The State also alleged that each of these offenses "was committed by one family or household member against another, and that this is a domestic violence offense as defined by RCW 10.33.020 and within the meaning of RCW 9.41.040." Clerk's Papers (CP) at 6-7. Sargent pleaded not guilty and the case proceeded to a jury trial.

### A. MOTION IN LIMINE: MENTAL HEALTH EVIDENCE

Before the witnesses started to testify, the parties discussed the State's motion in limine to exclude evidence of whether Crippen was in mental health counseling. The State contended that this evidence was inadmissible because it was irrelevant and presented an unfair risk of prejudice.

---

[1] The State charged this offense under RCW 9A.46.020(2)(b).

In response, defense counsel asked that the trial court limit evidence related to Sargent as well. The trial court granted the motion.

## B. TRIAL

Crippen, Cudal, and Detective Aldridge testified for the State. The State's witnesses testified to the facts set out above. Sargent did not present any witnesses.

### 1. CRIPPEN'S TESTIMONY

During direct examination, the State asked Crippen what happened when she and Sargent first arrived at the location of the incident. Crippen responded, "He started talking about hearing voices in his head." 1 RP at 98. Defense counsel objected.

With the jury absent, defense counsel stated that this testimony fell under the motion in limine regarding bringing up Sargent's mental health. The trial court questioned whether this actually fell under the ruling on the motion in limine, which it characterized as addressing whether Crippen or Sargent was in mental health counseling or whether they were prescribed antidepressants. The court discussed the limine order with counsel as it related to exclusion of evidence of mental health counseling and mental health diagnosis, as well as the evidence related to Sargent hearing voices. The court found the two topics distinguishable.

When the jury returned, defense counsel asked the trial court to instruct the jury to disregard the last response from the witness. The trial court stated that it had overruled the objection and declined to tell the jury to disregard Crippen's last answer.

Crippen testified that she believed Sargent would carry out his threats. She further testified that she feared Sargent's threats because he had told her about physically abusing an ex-girlfriend and had made prior comments about killing his ex-girlfriend if he saw her. Crippen stated that

Sargent had once told her about punching a hole in the wall of the home he had shared with his ex-girlfriend, pursuing her when she tried to flee, and then "beat[ing] her" when he caught her. 1 RP at 109. Defense counsel did not object to this testimony.

During his cross-examination of Crippen, defense counsel read several portions of Crippen's written statement and verified that Crippen had written those statements. Defense counsel quoted the following portion of the statement:

> "[Sargent] said now you have two enemies coming after you. You were -- you will never be safe. In fact, I will tell you the same thing I told my baby's mom. As long as I'm out of jail, your life is in danger. The only time you will ever be safe is if I'm locked up."

1 RP at 145-46. Defense counsel did not refer to Sargent's history of abuse of other victims at any other time while cross-examining Crippen.

Defense counsel also questioned Crippen about why she initially refused to give a written statement if she was afraid of Sargent. During this part of his cross-examination, defense counsel quoted portions of Crippen's statement that highlighted her fear of Sargent. Additionally, in closing argument, defense counsel argued that if someone was as terrified as Crippen claimed to have been in her statement, they would not have delayed filing a police report.

2. JUROR ISSUE

At the end of the first day of trial, juror 12 told the bailiff that he might know something about the case. When the trial court questioned the juror the next morning, the juror told the trial court that he had heard two of his friends discussing a woman named "Brandi or Brittany," who had a child and was previously married and stated that he was afraid that his friends could have been discussing Crippen. 2 RP at 179.

The trial court asked juror 12 whether he could still decide the case based on the evidence he heard in court. Juror 12 responded, "So I don't know if [what he had heard being discussed was] related to [Crippen], but if something came up that made it so that I knew one way or the other, that could potentially be a problem for me." 2 RP at 178. When the State and the trial court questioned juror 12 about what he had heard, juror 12 clarified that although he heard "negative things" about the woman's past, he did not hear anything that seemed related to this particular incident. 2 RP at 180.

The State expressed concern about whether juror 12 would be negatively influenced in his perception of Crippen. The State commented that it could either damage the State or it could damage the defense if it "elicits sympathy" for Crippen. 2 RP at 181. The State asked the trial court to excuse the juror because he had not said that "he could be fair and impartial." 2 RP at 182.

The trial court then had juror 12 return to the courtroom and questioned him about whether he thought he could be fair and impartial. The juror responded that he "would like to think so" but that it might be difficult to "separate out" "some of the things that [he] heard from a character perspective" if this was, in fact, the same person. 2 RP at 182.

The trial court then questioned juror 12 about how the information he had heard could affect his view of Crippen. Without being specific about what he had heard, the juror stated that he thought he could "separate it out" and that what he had heard was not "overly negative." 2 RP at 183. He characterized it as "just additional knowledge" that he wanted the court to be aware of and stated that he thought he could separate it out. 2 RP at 183.

The trial court responded,

But I will tell you at this time that I would be instructing you, if you were to remain on the jury, that you're not to discuss this conversation or any of the information in it with any other juror, and you are not to consider it in making your decision with regard to this case once it's been submitted to you for deliberation. That would be my order to you as -- part of it.

And my question is, and you're the only person that can answer this, can you follow that order?

2 RP at 184. Juror 12 responded that he thought he could. The trial court denied the State's motion to excuse juror 12.

3.  PROPOSED LIMITING INSTRUCTION AND JURY INSTRUCTIONS

After both parties rested, the trial court and the parties addressed the jury instructions. During this discussion, the State mentioned that it had proposed "a limiting instruction based on the prior bad acts of the defendant with an ex-girlfriend."[2] 2 RP at 235. Defense counsel stated that he did not want the limiting instruction and recognized that meant that "the jur[y] could consider the information for any purpose." 2 RP at 235. Defense counsel further commented, "There is just no point in it. It's like a red flag." 2 RP at 235. The trial court did not give the State's proposed jury instruction.

The trial court gave a to-convict instruction for the unlawful imprisonment charge that contained the following language now being challenged by Sargent:

If you find from the evidence that elements (1), (3), (4), and (5), and any of the alternative elements (2)(a) or (2)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. *To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (2)(a) or (2)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt*.

---

[2] The parties did not describe the exact language of the proposed limiting instruction, nor is the proposed limiting instruction part of our record.

CP at 29 (emphasis added).

The trial court also gave a reasonable doubt instruction that included the following final

paragraph:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. *If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt*.

CP at 21 (emphasis added).

It appears that the State proposed these instructions. Defense counsel did not object to

these instructions.

4.     CLOSING ARGUMENT

During its closing and rebuttal argument, the State did not mention Crippen's testimony

that Sargent had told her he had been hearing voices. But the State did mention Sargent's prior

threats and abusive behavior toward to his ex-girlfriend to support Crippen's testimony that a

reasonable person knowing what she knew would fear Sargent, stating,

> And these are not idle threats. These are not threats that he says in jest. These are serious threats. And they're specific threats. He tells Ms. Crippen, "As long as I'm not in prison, you're not safe. You're in the same boat as my baby mama now. That's what I told her."
> And Ms. Crippen knew. He had told Ms. Crippen at some point either consciously or not consciously about what he had done to this person, about what he had done to his ex-partner. And he chose in that moment to mention it again because he wanted to tell her, "I'm in control." He wanted to remind her, "Look what I can do." And so he says, "I'll do 10 years. I'll do 20 years. I'll kill you. It's nothing to me."
> Not only did he tell Ms. Crippen about how he threatened his ex, he also had told Ms. Crippen about a time he had assaulted that person, how he had chased this person down, taunted her, saying, "I'm going to catch up with you," and then beat this person up.

2 RP at 259-60.

In his closing argument, defense counsel admitted that Sargent was with Crippen on the night of the incident and that they had been arguing, but he argued that Crippen made her allegations because she was angry with Sargent for cheating on her. Defense counsel also discussed Crippen's delayed reporting. Defense counsel did not mention evidence of prior domestic violence by Sargent in his (defense counsel's) closing argument.

5.    VERDICT

The jury found Sargent guilty of felony harassment and unlawful imprisonment. The jury found him not guilty of fourth degree assault. The jury also found that Sargent and Crippen were members of the same family or household.

The judgment and sentence notes that both convictions included domestic violence allegations under RCW 10.99.020. Sargent appeals.

ANALYSIS

I. HEARING VOICES TESTIMONY

Sargent first contends that the trial court erred when it allowed Crippen to testify that Sargent said he had been hearing voices in his head. He argues that this was improper propensity evidence under ER 404(a) and that it was unfairly prejudicial under ER 403. These arguments fail.

A. LEGAL PRINCIPLES

We review a trial court's decision to admit evidence for abuse of discretion. *State v. Ashley*, 186 Wn.2d 32, 38-39, 375 P.3d 673 (2016). A trial court abuses its discretion if the "'exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Black*, 191 Wn.2d 257, 266, 422 P.3d 881 (2018) (internal quotation marks omitted) (quoting *In re Det. of Post*, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010)).

## B.  ER 404(a)

Sargent argues that Crippen's testimony about his statement that he had been hearing voices was inadmissible propensity evidence under ER 404(a).[3]  But Sargent did not object on this ground in the trial court, and the appellant waives evidentiary objections not raised at trial unless the alleged errors are manifest errors affecting constitutional rights.  RAP 2.5(a).

Sargent does not argue that ER 404(a) is of constitutional magnitude.  RAP 2.5(a). Accordingly, he has waived his argument that this evidence was inadmissible under ER 404(a).

## C.  ER 403

Sargent also argues that Crippen's testimony that Sargent hearing voices was inadmissible under ER 403 because it was unfairly prejudicial.  The State's motion in limine asserted that evidence of Crippen's mental health treatment was unfairly prejudicial and Sargent argued evidence of his mental health treatment was inadmissible on the same grounds.  Consequently, Sargent has arguably preserved this argument for appeal.

ER 403 allows a trial court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice."  Evidence may be unfairly prejudicial when it generates an emotional rather than a rational response by the jury or when it promotes a decision on an improper basis.  *State v. Haq*, 166 Wn. App. 221, 261, 268 P.3d 997 (2012) (quoting *State v. Cronin*, 142 Wn.2d 568, 584, 14 P.3d 752 (2000)).  The trial court has "considerable discretion to consider the relevancy of evidence and to balance 'the probative value of the evidence

---

[3] Subject to several exceptions that are not relevant here, ER 404(a) provides, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."

against its possible prejudicial impact.'" *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014) (quoting *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987)).

The definition of harassment provides that "[a] person is guilty of harassment if: . . . [t]he person by words or conduct places the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(b). "Basic principles of due process require the State to prove every essential element of a crime beyond a reasonable doubt." *State v. Cantu*, 156 Wn.2d 819, 825, 132 P.3d 725 (2006). Here, Sargent's statement to Crippen was relevant to whether she reasonably feared that he would carry out his threats, a necessary element of the felony harassment charge which must be proven beyond a reasonable doubt. State of mind evidence in the context of domestic violence harassment cases and domestic violence assault cases is relevant and admissible. *State v. Fisher*, 165 Wn.2d 727, 744, 202 P.3d 397 (2009).

Crippen's state of mind during the exchange with Sargent directly bears on the statutory element of the reasonableness of her fear that Sargent's threats would be actualized. Advisement by Sargent that he was hearing voices could reasonably be interpreted by Crippen that Sargent was subject to being influenced by internal stimuli, rendering him refractory to being reasoned with. Because Sargent's admission of the hearing voices was relevant to Crippen's state of mind, admission of this testimony was within the trial court's discretion. The trial court's "to convict" jury instruction on the harassment charge properly incorporated the legal test. Given the direct relevance of the testimony to the necessary proof, Sargent fails to establish that the trial court abused its discretion by allowing this testimony.

## II. JURY INSTRUCTION ISSUES

Sargent next challenges the use of two jury instructions. He argues that the to-convict instruction for the unlawful imprisonment charge failed to require the jury to be unanimous and deprived him of his right to a unanimous verdict. He also argues that the reasonable doubt instruction was improper because it did not require proof beyond a reasonable doubt. These arguments fail.

### A. PRINCIPLES OF LAW

We review errors of law in jury instructions de novo. *State v. Fleming*, 155 Wn. App. 489, 503, 228 P.3d 804 (2010). Jury instructions are sufficient if, when read as a whole, they are not misleading and "properly inform the jury of the applicable law." *Fleming*, 155 Wn. App. at 504.

### B. JURY INSTRUCTION 12: UNANIMITY

Sargent argues that trial court erred in giving jury instruction 12, the to-convict instruction for the unlawful imprisonment charge, asserting this instruction expressly informed the jury that it did not have to reach a unanimous verdict on the alternate elements.[4] Even presuming, but not deciding, that unlawful imprisonment is an alternative means crime, these arguments fail.

In Washington, criminal defendants have a constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21; *State v. Woodlyn*, 188 Wn.2d 157, 162-63, 392 P.3d 1062 (2017). But if each alternative means is supported by sufficient evidence, "Washington defendants do not enjoy a recognized right to express unanimity." *Woodlyn*, 188 Wn.2d at 164.

---

[4] Although Sargent did not object to this instruction in the trial court, we reach this issue because it potentially involves manifest error affecting a constitutional right under art. I, § 21 of the Washington Constitution. RAP 2.5(a)(3).

Sargent challenges the following portion of jury instruction 12: "To return a verdict of guilty, *the jury need not be unanimous* as to which of alternatives (2)(a) or (2)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt." CP at 29 (emphasis added). He argues that because this instruction affirmatively instructed the jury that it did not have to be unanimous as to each alternative element, he was deprived his right to a unanimous verdict.[5]

In *State v. Armstrong*, 188 Wn.2d 333, 394 P.3d 373 (2017), our Supreme Court addressed language in an instruction that was essentially identical to the challenged alternate means language in jury instruction 12.[6] The *Armstrong* court held that instructing "the jury that it need not be unanimous as to which of the two means it relied on, so long as it was unanimous as to the conviction," was "a correct statement of the law." 188 Wn.2d at 336.

In *State v. Ortega-Martinez*, 124 Wn.2d 702, 707-08, 881 P.2d 231 (1994), the court framed the question of unanimity in alternate means cases slightly differently, focusing on evidentiary sufficiency. "The evidence is sufficient if 'after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the

---

[5] We note that Sargent does not argue that the evidence was insufficient to support each alternative means. Accordingly, we do not address the sufficiency of the evidence.

[6] The instruction at issue in *Armstrong* gave the jury two alternative means, set out in sections (4)(a) and (4)(b) of the instruction in that case, and stated,

> "If you find from the evidence that elements (1), (2), (3) and (5), and either of the alternative elements (4)(a) or (4)(b), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return verdict of guilty, the jury need not be unanimous as to which of alternatives (4)(a), or (4)(b), has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt."

188 Wn.2d at 338.

charged crime beyond a reasonable doubt.'" *Ortega-Martinez*, 124 Wn.2d at 708 (quoting *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990)).

*Armstrong* raised the same argument Sargent is raising here, asserting "that sufficient evidence cannot be a basis to affirm in this particular case because the court committed affirmative constitutional error by instructing the jury that it need not be unanimous." 188 Wn.2d at 342. Acknowledging that "an instruction on jury unanimity as to the alternative method found is preferable," the *Armstrong* court expressly rejected Armstrong's argument and held that his "right to jury unanimity was preserved" and that the instruction was not improper. 188 Wn.2d at 344.

The instruction here is identical to the instruction in *Armstrong*, hence Sargent fails to show that the instruction deprived him of his right to a unanimous verdict.[7] As noted, Sargent also fails to argue the evidence was insufficient to support each alternative means. Accordingly, this argument fails.

### C. JURY INSTRUCTION 4: REASONABLE DOUBT

Sargent next argues that the trial court erred in giving jury instruction 4, the reasonable doubt instruction, as it allowed the jury to convict on a "'belief in the truth of the charge'" rather than requiring proof of the elements beyond a reasonable doubt.[8] Br. of Appellant at 26. The

---

[7] Sargent also argues that *Armstrong* should be overruled because it is incorrect and harmful. But we are bound to follow our Supreme Court's majority decisions. *In re Pers. Restraint of Le*, 122 Wn. App. 816, 820, 95 P.3d 1254 (2004).

[8] Sargent asserts that defense counsel objected to this instruction, the record does not support this assertion, and this assertion is inconsistent with Sargent's earlier description of the facts. Although Sargent did not object to this instruction in the trial court, we reach this issue because it implicates a potential manifest error affecting a constitutional right (proof of guilt beyond a reasonable doubt) and the resolution of this issue will also resolve Sargent's ineffective assistance of counsel claim based on defense counsel's failure to object to this instruction. RAP 2.5(a).

trial court derived this instruction from 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 93 (4th ed. 2016). This argument fails.

Sargent contends that the trial court's reasonable doubt instruction, jury instruction 4, was improper because it included language stating, "If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." CP at 21. Sargent argues that this portion of jury instruction 4 improperly focused the jury on a search for "the truth," rather than determining whether the State had met its burden of proving the elements of the crime beyond a reasonable doubt. Having addressed and rejected this same argument in *State v. Jenson*, 194 Wn. App. 900, 901-02, 378 P.3d 270 (2016), we adhere to our precedent and hold that the trial court's reasonable doubt instruction was not improper.

### III. DOMESTIC VIOLENCE DESIGNATION

Sargent next contends that the trial court erred when it applied the domestic violence designation to his felony harassment conviction. He argues that the application of the domestic violence designation to the felony harassment conviction was improper because felony harassment is not included in the list of possible domestic violence offenses set out in RCW 10.99.020. This argument fails.

### A. PRINCIPLES OF LAW

Whether the trial court could apply the domestic violence designation to the felony harassment conviction is an issue of statutory interpretation. We review issues involving statutory interpretation de novo with the goal of giving effect to the legislature's intentions. *State v. Gray*, 189 Wn.2d 334, 339, 402 P.3d 254 (2017).

Our analysis starts with the plain language of the statute. *Gray*, 189 Wn.2d at 340. We construe statutes "'so that all the language used is given effect, with no portion rendered

meaningless or superfluous.'" *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005) (internal quotation marks omitted) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)). Additionally, "we will not read a statute in isolation; we determine its plain meaning by taking into account 'the context of the entire act' as well as other related statutes." *Gray*, 189 Wn.2d at 340 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

## B. DISCUSSION

RCW 10.99.020(5) provides a nonexclusive list of 23 different felonies that constitute domestic violence offenses. This statute directly specifies that domestic violence crimes are not restricted solely to the listed felonies. RCW 10.99.020(5).

Sargent is correct that felony harassment is not among the specifically enumerated offenses. That does not conclude the statutory analysis. Even though felony harassment "is not included in that list, the definition expressly states that domestic violence is not limited to the crimes listed." *State v. Lindahl*, 114 Wn. App. 1, 17, 56 P.3d 589 (2002). Thus, unless Sargent can show that the plain language of the statute is not controlling, the trial court did not err in applying the domestic violence designation to his felony harassment conviction.

Sargent contends that "[t]he detailed, explicit, and expansive nature of the list strongly suggests that, despite any prefatory language, it is, in fact, meant to be an exhaustive list of all domestic violence offenses." Br. of Appellant at 15. This argument is not persuasive because it would require us to ignore the express language of the statute specifying that this is a nonexclusive list, which we decline to do. *Roggenkamp*, 153 Wn.2d at 624 (we construe statutory language to give effect to all the language used in the statute). Additionally, the "expansive nature" of the list suggests that the type of offense that can qualify as a domestic violence offense is very broad.

17

Sargent also contends that although the list is not exclusive, the crime of felony harassment is not a domestic violence offense because it is not consistent with the enumerated offenses. We disagree.

"Washington courts have consistently interpreted the statutory language, 'including but not limited to,' to indicate the legislative intent to create an illustrative, not exhaustive, list." *State v. Joseph*, 3 Wn. App. 2d 365, 372, 416 P.3d 738 (citing *State v. Larson*, 184 Wn.2d 843, 849, 365 P.3d 740 (2015)), *review denied*, 191 Wn.2d 1022 (2018). When confronted with a nonexclusive list, we assume that the statute includes things of a similar or comparable nature to those specifically named in the list. *Joseph*, 3 Wn. App. 2d at 372 (quoting *Larson*, 184 Wn.2d at 849).

The list here includes a variety of physical and property crimes. *See* RCW 10.99.020(5) (a)-(f), (h)-(q). It also includes crimes that are less clearly physical or property crimes such as coercion (RCW 9A.36.070) and stalking (RCW 9A.46.110), which are crimes that have more of a psychological effect. RCW 10.99.020(5)(g), (v). All of these crimes can be committed against family or household members. Although felony harassment is not necessarily a physical or property crime, it is clearly a crime that can be committed against a family or household member and one that has the risk of creating substantial psychological harm. In fact, harassing behavior is included in the enumerated crime of stalking. RCW 9A.46.110(1)(a). Thus, contrary to Sargent's assertion, felony harassment is fully consistent with the type of crimes that are specifically enumerated in RCW 10.99.020(5).

Furthermore, RCW 9.94A.525(21)(a)[9] demonstrates that the legislature contemplated felony harassment as a domestic violence offense. RCW 9.94A.525(21) provides, in part,

> If the present conviction is for a felony domestic violence offense where domestic violence as defined in RCW 9.94A.030 was pleaded and proven, count priors as in subsections (7) through (20) of this section; however, count points as follows:
>     (a) Count two points for each adult prior conviction *where domestic violence as defined in RCW 9.94A.030 was pleaded and proven* after August 1, 2011, for any of the following offenses: A felony violation of a no-contact or protection order RCW 26.50.110, *felony Harassment* (RCW 9A.46.020(2)(b)).

(Emphasis added.) The express inclusion of felony harassment in this sentencing statute demonstrates that the legislature intended the domestic violence designation to apply to felony harassment convictions.

RCW 26.50.010(3)(a) also supports the conclusion that harassment can be a domestic violence offense. RCW 26.50.010(3)(a) defines domestic violence as "[p]hysical harm, bodily injury, assault, or *the infliction of fear of imminent physical harm*, bodily injury or assault, between family or household members." (Emphasis added.) The trial court record is replete with testimony reflecting Sargent's threats to punch, physically harm, and kill Crippen. Although RCW 26.50.010(3)(a) does not specifically refer to "harassment," a person is guilty of the crime of harassment if, as here, he threatens "[t]o cause bodily injury immediately or in the future to the person threatened" and the infliction of fear of imminent physical harm meets that requirement. RCW 9A.46.020(1)(a)(i). Because the elements of harassment fit squarely within the definition

---

[9] The legislature amended this statute in 2017 with an effective date of July 23, 2017. LAWS OF 2017, ch. 272, § 3. Because this amendment did not change subsection (21), we cite to the current version of the statute.

of domestic violence, RCW 26.50.010(3)(a) demonstrates that harassment can qualify as a domestic violence offense.

The plain language of RCW 10.99.020(5), read in conjunction with the related statutes RCW 26.50.010(3)(a) and RCW 9.94A.525(21)(a), establish that felony harassment may be considered a domestic violence offense. It would be anomalous, indeed, to exclude harassment from a designated domestic violence offense in light of the express legislative finding located in RCW 9A.46.010, which specifies,

> The legislature finds that the prevention of serious, personal harassment is an important government objective. Toward that end, this chapter is aimed at making unlawful the repeated invasions of a person's privacy by acts and threats which show a pattern of harassment designed to coerce, intimidate, or humiliate the victim.

Accordingly, we hold that the trial court did not err when it designated the felony harassment conviction as a domestic violence offense under RCW 10.99.020(5).[10]

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Sargent next claims that he received ineffective assistance of counsel on several grounds. These arguments fail.

### A. STANDARD OF REVIEW

To prevail on an ineffective assistance of counsel claim, Sargent must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Representation is deficient if, after

---

[10] Because of this holding, we do not address Sargent's sentencing arguments, which are based entirely on the premise that the trial court improperly designated the felony harassment conviction as a domestic violence offense.

considering all the circumstances, it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Prejudice exists if there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Grier*, 171 Wn.2d at 34.

### B. READING PORTIONS OF CRIPPEN'S STATEMENT

Sargent argues that defense counsel's reading of portions of Crippen's statement while cross-examining Crippen was ineffective assistance of counsel.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). Sargent contends that, in this instance, defense counsel's use of Crippen's statement during cross-examination was not a reasonable tactical decision because defense counsel did not adequately "frame his cross-examination for the jury," and the lack of context allowed this evidence to "highlight[ ] and reinforc[e] in the minds of the jury all of the most damaging facts in the case." Br. of Appellant at 31. We disagree.

On cross-examination, defense counsel questioned Crippen about why she waited until April 24 to give a sworn written statement. Defense counsel quoted portions of Crippen's statement that highlighted her fear of Sargent and then asked her why, given the serious nature of the allegations and Crippen's assertions that she was in fear during and after the incident, Crippen chose to not give a statement for several weeks. Additionally, in closing argument, defense counsel argued that if someone was as terrified as Crippen claimed to have been in her statement, they would not have delayed filing a police report. Defense counsel's questioning and argument clearly provided context for the jury. Thus, Sargent fails to show that it was an unreasonable tactical

decision for defense counsel to use Crippen's statement to support the defense theory, and this ineffective assistance of counsel claim fails.

### C. OPPOSITION TO REMOVAL OF JUROR

Sargent further argues that defense counsel's opposition to the removal of juror 12 was ineffective assistance of counsel. He contends that given the nature of the juror's knowledge of Crippen, the only reasonable action was for defense counsel to join in the State's request that the trial court remove the juror.

Although defense counsel did not join in the State's motion to dismiss juror 12, the trial court fully considered the State's motion and denied the motion. Sargent does not show how defense counsel's joinder in the motion to dismiss juror 12 would somehow have changed the court's ruling or the outcome of the trial. Accordingly, this ineffective assistance of counsel claim fails.

### D. REJECTION OF LIMITING INSTRUCTION

Sargent next argues that defense counsel's decision to decline the State's proposed limiting instruction regarding the evidence of prior acts of domestic violence was ineffective assistance of counsel. We disagree.

It is well established that the failure to request a limiting instruction may be a legitimate tactical decision designed to avoid reemphasizing damaging evidence. *State v. Yarbrough*, 151 Wn. App. 66, 90-91, 210 P.3d 1029 (2009). Here, defense counsel expressly stated that he was not requesting the limiting instruction specifically for this purpose. Sargent contends, however, that this was not a reasonable tactical decision because defense counsel's cross-examination of Crippen established that defense counsel was not concerned about emphasizing this evidence.

Although defense counsel questioned Crippen on cross-examination about her statement, which contained a brief reference to Sargent's domestic violence against a former girlfriend, this questioning was in the context of defense counsel presenting evidence that was relevant to whether Crippen's delayed reporting was credible. Nothing in defense counsel's cross-examination suggested that the jury should use this information as propensity evidence. Additionally, defense counsel's closing argument did not suggest that this evidence was propensity evidence. In fact, defense counsel did not mention this evidence at all. Thus, contrary to Sargent's assertion, there is nothing in the record suggesting that defense counsel was not concerned about emphasizing the evidence of Sargent's prior acts of domestic violence.

Furthermore, the State's evidence and argument did not suggest that this was propensity evidence. Instead, the State's argument focused on this evidence being relevant to Crippen's reasonable fear.

The evidence of Sargent's domestic violence against his prior partner was presented in contexts that had nothing to do with Sargent's propensity and nothing the jury heard suggested that it could use this evidence as propensity evidence. It was reasonable for defense counsel to want to avoid putting the idea that this could be evidence of propensity in the jury's mind. Thus, Sargent does not show that defense counsel's decision to refuse the limiting instruction was not a reasonable tactical decision, and this ineffective assistance of counsel claim fails.

E.  JURY INSTRUCTIONS

Sargent further argues that defense counsel provided ineffective assistance by failing to object to the to-convict instruction for unlawful imprisonment because it failed to require the jury to be unanimous and deprived him of his right to a unanimous verdict and to the reasonable doubt instruction because it did not require proof beyond a reasonable doubt.  These arguments fail because, as discussed above, these instructions were not improper.

F.  DOMESTIC VIOLENCE DESIGNATION

Sargent claims ineffective assistance of counsel based on counsel's failure to object to the application of the domestic violence designation to the felony harassment charge.  Since harassment is properly included as a domestic violence offense, this claim is without merit.

V.  CUMULATIVE ERROR

Finally, Sargent argues that cumulative error deprived him of his right to a fair trial.  Under the cumulative error doctrine, we may reverse an appellant's convictions if the combined effect of trial errors effectively denied the appellant his right to a fair trial, even if each error alone would be harmless.  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  Sargent has failed to identify any error, making the cumulative error doctrine inapplicable.

No. 50834-6-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
RUMBAUGH, J.P.T.

We concur:

_____
MAXA, C.J.

_____
SUTTON, L.